UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 02-60585 - Civ - Dimitrouleas

NET MANAGEMENT SERVICES, a Nevis )
limited liability company, )
)
Plaintiff, )
)
v. )
)
PERFECT 10, INC., a California corporation, )
and DOES 1-10, inclusive, )
)
Defendants. )
)
)
_____ )



## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PERFECT 10, INC.'S MOTION TO DISMISS, TRANSFER OR STAY PLAINTIFF'S COMPLAINT FOR DECLARATORY RELIEF

### I.   PRELIMINARY STATEMENT

The commencement of this action for declaratory relief in Florida constitutes blatant forum shopping by plaintiff Net Management Services, LLC ("NMS"). This action was filed by NMS knowing that a suit based on existing claims imminently would be filed by defendant Perfect 10, Inc. ("Perfect 10") in the Los Angeles District Court. NMS and its Los Angeles litigation counsel actively engaged in brazen fraud in order to delay the filing in California and to pursue this cynical "race to the courthouse." At bottom, NMS' motivation could not be clearer: on the eve of NMS' filing, the Court in Los Angeles published a 106-page opinion in pending related litigation (the "Cybernet action"), entering a preliminary injunction on the basis of the same facts and claims that will be proven here against NMS.



NMS manages and serves as the hub of a major ring of pornographic websites that trade in illegal content. This unlawful content includes (i) pictures that infringe Perfect 10's copyrights[1] and (ii) vast quantities of celebrity images that compete unfairly with Perfect 10. The celebrity content consists of tens or hundreds of thousands of unauthorized images of celebrities, including "fake" images that superimpose pictures of celebrities over images of persons engaged in nude poses or sexual activity, so that it falsely appears as though the celebrity is engaged in such conduct.

Following the issuance of the tentative opinion in the Cybernet action (later entered as the Order of the Court) and the receipt of a cease and desist letter from Perfect 10, NMS' General Counsel in Florida and its litigation counsel in Los Angeles flatly misrepresented NMS' intentions and conduct in order to delay the filing of Perfect 10's complaint in California. NMS said that it was changing its websites to eliminate the problem; that it wanted to "cooperate"; that it needed more time for its "investigation"; and that Perfect 10's claims would be resolved "without litigation" -- all while it secretly prepared its complaint for filing in Florida. Indeed, the morning after NMS actually filed its complaint for declaratory relief in Florida, its counsel, apparently uncertain whether the complaint was yet on file, misrepresented in writing that "[w]e trust that litigation will not be necessary"! The dishonesty of NMS in trying to choose the forum of its choice is shocking.

Perfect 10 filed its more inclusive action in the Los Angeles District Court six days after NMS secretly filed its complaint in this Court. This action should be dismissed, transferred to the Central District of California, or stayed. First, NMS should not be permitted to use the Declaratory Judgement Act to usurp Perfect 10's right to choose the forum for its suit, especially when, as here, NMS has engaged in demonstrable deceit and bad faith to achieve its first filing.

Second, only in California can complete relief be granted among the parties. The California action includes claims and parties not before this Court and important to a complete resolution of Perfect 10's claims, including parties resident in California.

---

[1] Unlike NMS, Perfect 10 does not publish hardcore images. (Declaration of Norman Zadeh ["Zadeh Decl."] ¶ 8.)

Third, the availability of witnesses and convenience of the parties compels the Los Angeles venue. Numerous important individual witnesses, including the celebrities whose images are used without authorization, are residents of Los Angeles and not subject to the subpoena power of this Court in connection with the trial of these claims.

Finally, the Cybernet action and a second related case already are pending before the Los Angeles District Court and coordinated before the same District Court Judge. That Court is familiar with the facts and claims -- many of which raise issues of California law -- involved in this action. Indeed, it obviously was that very familiarity, and the resulting opinion in the Cybernet action, that caused NMS to engage in the abusive tactics outlined below.

## II.   FACTUAL BACKGROUND

### A.   Perfect 10's Business and Intellectual Property

Perfect 10 is a California corporation with its principal place of business in Los Angeles County, California. (Zadeh Decl. ¶ 6.) Perfect 10 is the publisher of the well-known adult entertainment website <perfect10.com> and magazine doing business under the trademark "PERFECT 10." (*Id.* ¶ 7.) Due to the popularity of its photographs, Perfect 10 products have been featured in numerous media outlets, including movies, television programs, radio shows, and newspapers.[2] (*Id.* ¶ 9.)

Perfect 10 has made a substantial investment to create the images of Perfect 10 models for display in its Internet and print publishing products. (*Id.* ¶ 10.) Perfect 10 has obtained registered copyrights in its photographic works in order to protect them from unauthorized copying. (*Id.* ¶¶ 11-12, Exh. 1.) In addition, Perfect 10 models have assigned to Perfect 10 their rights of publicity associated with the images created by Perfect 10. (*Id.* ¶ 13.)

### B.   NMS' Business Giving Rise to Perfect 10's Claims

NMS manages and markets a huge network of hardcore pornographic Internet websites containing stolen content. (*Id.* ¶¶ 15-20.) NMS' corporate headquarters are located in Florida, but

---

[2] For example, such television programs include: The Tonight Show, Howard Stern Show, The Sopranos, Dawson's Creek, Battledome, Fox News, Hard Copy, Entertainment Tonight, Extra, and Monday Night Football. The movies include: American Pie, Hollow Man, The Way of the Gun, and Spiderman. (*Id.* ¶ 9.)

3

NMS does business throughout the world over the Internet, including in California. Websites controlled by NMS, which jointly engage with NMS in the wrongful conduct of which Perfect 10 complains, are located in California. (*Id.* ¶¶ 25-26.)

NMS serves as the hub of this network of pornographic websites. It directly participates in the activities of the network in several ways. First, NMS manages and controls the website at <TrafficCashGold.com>, which promotes, supports, and links to the pornographic websites (the "Traffic Cash Websites"). (*Id.* ¶ 15, Exh. 3 at 1, 4.) Second, NMS manages some of the individual pornographic websites. (*Id.* at 1.) Third, NMS manages the website at <Sexcheck.com>, a purported adult verification service that networks together, promotes, and provides links to affiliated pornographic websites (the "Sex Check Websites"). (*Id.* ¶ 18, Exh. 5 at 1.) Finally, to market the networks of websites and individual websites described in this paragraph, NMS controls an affiliate network of "free" websites (the "Referral Websites"), which offers pornographic content and advertises and links consumers to other websites controlled by NMS. (*Id.* ¶ 16, Exh. 3 at 5-6.) NMS pays money to the webmasters of Referral Websites as compensation for referring customers to NMS. (*Id.*)

These networks of websites controlled by NMS contain massive stolen content offered for sale in competition with Perfect 10. The stolen content includes Perfect 10 images as well as tens or hundreds of thousands of other stolen celebrity images. The celebrity images include (i) pictures scanned into the computers of participating websites from virtually every magazine and film, as well as (ii) images of celebrities superimposed on images of persons in nude poses or engaged in sexual conduct, so that it falsely appears that the celebrities are nude or engaged in sexual activity. (*Id.* ¶¶ 17, 20, Exhs. 4, 7-8.) In addition to these images, the Referral Websites and other websites controlled by NMS include advertising banners for and links to websites controlled by NMS, which falsely advertise content on the NMS websites, such as advertising that the NMS websites include images of "Britney Spears Uncensored Fake Pics" and "Check Out Buffy's Muffy." These advertisements, intended to induce consumers to link to NMS' other websites, are created by NMS and located on one of its hub websites for NMS sites to "grab" and post on their websites. The advertisements misrepresent the celebrity content on the NMS websites. (*Id.* ¶¶ 17, 20, Exhs. 4, 8.)

**C.     The Background to the More-Inclusive Pending California Action**

NMS' motivation for forum shopping could not be plainer.  On March 25, 2002, the Los Angeles District Court, Judge L. G. Baird presiding, issued a 106-page tentative opinion in nearly identical, related litigation pending in California, *Perfect 10, Inc. v. Cybernet Ventures, Inc., et al.*, U.S.D.C. Case No. CV 01-2595 LGB (SHx) (the "Cybernet action").  (Declaration of Ronald L. Johnston ["Johnston Decl."] ¶ 3.)  The tentative ruling was adopted by the Court in all relevant respects as its final decision and was entered on April 24, 2002.  A copy of the decision is attached as Exhibit 2 to the Johnston Declaration (the "California Order").  The tentative opinion and the Court's final decision were to grant to Perfect 10 a preliminary injunction in a case that involves the same facts and claims as those present in this case.  What happened between the tentative and final decisions of the Los Angeles District Court in the related Cybernet action establish NMS' bad faith forum shopping.

**1.     The Cybernet Action**

The California Order granted a preliminary injunction against Cybernet Ventures, Inc. ("Cybernet"), another operator, like NMS, of a hub website for a pornographic network on the Internet.  The wrongful conduct of Cybernet and its affiliated websites is indistinguishable from that of NMS and its affiliated websites in relevant respects.  Both Cybernet and NMS control networks linking together thousands of websites selling access to stolen images of models and celebrities.  Both companies operate in part under the pretext of serving as an age verification service for linked sites, while marketing and promoting the linked sites.  Most fundamentally, both Cybernet and NMS contribute to the infringement by affiliated websites of Perfect 10's copyrights and unfairly compete with Perfect 10 by selling access to tens or hundreds of thousands of stolen celebrity images.  (*See* Zadeh Decl. ¶¶ 15-20.)

In entering the preliminary injunction against Cybernet, the District Court in Los Angeles held that Perfect 10 had demonstrated a likelihood of success in proving that Cybernet (i) had secondary liability for the infringement of Perfect 10's copyrights on the affiliated websites and (ii) was liable for unfair competition by reason of the sale in competition with Perfect 10 of unauthorized celebrity images.  The exact same facts and claims will be proven against NMS.

## 2.   The April 9, 2002 Explicit Threat by Perfect 10 of Suit Against NMS

Following the issuance of the tentative ruling and prior to entry of the final Order, by letter dated April 9, 2002, Perfect 10 sent a cease and desist letter to NMS describing violations of Perfect 10's copyrights and trademarks on the NMS websites and the unfair competition being committed by these websites against Perfect 10. (*Id.* ¶ 12, Exh. 2.) Perfect 10 specifically demanded that NMS: (1) cease the display of material on NMS websites that infringes Perfect 10's copyrights, trademarks, or rights of publicity (or, in the alternative, to disable access to controlled websites displaying such images); and (2) cease unfairly competing against Perfect 10 by the unauthorized display of pictures of celebrities on the NMS websites (the "Cease and Desist Letter"). (*Id.*)

The April 9 Cease and Desist Letter concluded by demanding action "no later than April 29, 2002 to confirm the NMS Businesses' willingness to remedy the illegal conduct." In the event such action was not forthcoming by that date, the letter stated that Perfect 10 "shall take whatever steps are necessary to preserve and protect Perfect 10's rights." (*Id.*)

What followed the Cease and Desist Letter was a series of brazen misrepresentations by NMS, designed to delay Perfect 10 from filing its threatened action, while NMS readied and filed the instant complaint in Florida. The misrepresentations took the form of promises of cooperation by NMS' General Counsel in Florida and persistent urgings by NMS' California litigation counsel that Perfect 10 delay filing a complaint so the parties could talk.

## 3.   NMS' Deceitful Scheme to Delay Perfect 10 from Filing Suit in California

In response to Perfect 10's Cease and Desist Letter, NMS' General Counsel, Mr. Workman, wrote to Perfect 10, misrepresenting NMS' intentions, by promising cooperation. On April 18, Mr. Workman wrote that NMS "[was] happy to cooperate with [Perfect 10] with respect to any property rights of Perfect 10." (*Id.* ¶ 18, Exh. 5 at 1.) On April 23, he again wrote:

> I am continuing with my investigation . . . Can we agree to <u>continue our dialog beyond the April 29 date</u> stated in your initial letter? This is quite a <u>busy week</u> for me, and I want to have an adequate opportunity to address your concerns. (Johnston Decl. ¶ 9, Exh. 7.)

With the benefit of hindsight, it is now very clear that it was in fact a "busy week" for Mr. Workman -- it was the week that NMS filed its complaint to commence this action. It was not a

week in which Mr. Workman "continued" his purported "investigation" to "address your concerns." This action was commenced by NMS two days after Mr. Workman's letter, on Thursday, April 25, 2002.

During that same week, both on April 23 and April 26, NMS' <u>California litigation counsel</u>, Mr. Spillane, called Perfect 10's counsel seeking to make sure that Perfect 10 was not going to file litigation against NMS while NMS purportedly made certain changes in its websites, which would be completed the following week and resolve the claims of Perfect 10, according to Mr. Spillane. (Declaration of Jeffrey Mausner ["Mausner Decl."] ¶ 2; Johnston Decl. ¶ 4.) Indeed, on April 26 -- <u>the day after NMS managed hurriedly to file this action in Florida</u> -- Mr. Spillane wrote to Perfect 10, expressly confirming his misrepresentations during the earlier phone calls and brazenly repeating them again, in writing, as follows:

> I explained that our client was reviewing the claims . . . and was interested in reaching a resolution, <u>without litigation</u>, of the questions raised in the [Cease and Desist Letter].
>
> <u>We trust that litigation will not be necessary</u>. (Mausner Decl. ¶ 3, Exh. 1 at 1-2, emphasis added)

In fact, at the very moment Mr. Spillane telephoned Perfect 10's counsel on April 26 and put pen to paper, <u>NMS was secretly filing this action in Florida</u>. The repeated and dishonest representations by Messrs. Workman and Spillane obviously were intended only to deceive Perfect 10 into delaying its actions so that NMS could attempt to pick its forum with a purported "first filed" complaint.

The California Order was entered on April 24, 2002. The tentative ruling and final Order apparently provided a huge incentive to NMS to forum shop. NMS literally ran to this Court to file the instant complaint the next day after entry of the Order, on April 25, 2002. Perfect 10 learned of the complaint in this action on May 1, 2002, when Mr. Spillane faxed a copy to Perfect 10's counsel, requesting that they accept service on behalf of Perfect 10. (Johnston Decl. ¶ 5, Exh. 3 at 1.)

**D.     The Complaints in the California and Florida Actions.**

The declaratory relief complaint filed in this action by NMS literally is a subset of the claims in the California action commenced by Perfect 10. Complete relief among the parties can

only be granted in the California action.  (Section III.B., *infra*.)  The complaint in the California action seeks broader relief than that sought in the complaint in the Florida action, and joins additional parties located in California and potentially not available for suit in Florida.[3]  Indeed, the Florida complaint does nothing more than incorporate by reference the Cease and Desist letter and was motivated by nothing more than a desire to beat Perfect 10 to the courthouse.  (*See* Johnston Decl. ¶ 5, Exh. 3 at 7.)  By contrast, the California complaint was prepared with appropriate legal relief in mind and an intention to avoid a multiplicity of litigation.

On May 7, 2002, Perfect 10 filed its complaint in the Central District of California.  At that time, Perfect 10 also filed a Notice of Related Case, indicating the action's relationship to the Cybernet Action and starting the process of having the complaint transferred to Judge Baird.  (*Id.* ¶ 7, Exh. 4.)  A third case recently filed in the Central District of California by Perfect 10, also involving substantially similar issues, *Perfect 10, Inc. v. Tri-Tech Internet Services, Inc., et al.*, U.S.D.C. Case No. CV 02-3498 ABC (CWx) (the "Tri-Tech Action"), was transferred to Judge Baird pursuant to Perfect 10's Notice of Related Case.  (*Id.* ¶ 8, Exhs. 5, 6.)

The California complaint pleads claims against NMS as well as nine other defendants for copyright infringement, trademark infringement, trademark disparagement, wrongful use of a registered mark, violation of the right of publicity, unfair competition, false and misleading advertising, and RICO violations (investment of proceeds and participation in a criminal enterprise). The defendants joined in the California action in addition to NMS are key parties to the joint wrongdoing described in Section I.B. above, including, among others, a defendant resident of California and owning Referral Websites (*Id.* ¶ 2, Exh. 1 at 11), suppliers of illegal content located in California (*id.* at 13), and operators of important individual websites infringing Perfect 10's rights.

The conduct of the additional defendants in the California action, who are not parties in the Florida action, provides the basis for the allegations of secondary liability against NMS, and these parties are material to a judgment granting complete relief.  Due to the manner in which NMS does

---

[3] The California and Florida complaints are attached, respectively, as Exhibits 1 and 3 (attached to the May 1, 2002, letter) to the Johnston Declaration.

business -- as the hub of the network of websites acting illegally -- the claims of secondary liability are key to a disposition of this or the California action, as they were in the Cybernet action, as explained by the District Court in Los Angeles. (*Id.*, Exh. 2 at 43, 77-81, 85.)

**III.   NMS' ANTICIPATORY DECLARATORY JUDGMENT ACTION SHOULD BE DISMISSED BECAUSE IT IS NOTHING MORE THAN BLATANT FORUM SHOPPING**

    **A.   The First-to-File Rule Does Not Apply in this Case**

The facts of this case unequivocally indicate that NMS engaged Perfect 10 in a bad faith "race to the courthouse."  NMS filed this declaratory judgment action just one day after Judge Baird granted Perfect 10 a preliminary injunction in the California Cybernet Action, at the same time NMS was imploring Perfect 10 not to file suit against NMS and misrepresenting its intentions and actions.  While pleading with Perfect 10's attorneys to delay filing suit (*e.g.*, representing that Perfect 10's claims should be resolved "without litigation"), NMS was busy preparing and filing its own suit against Perfect 10 in *its* home state of Florida.  NMS' actions in filing this declaratory judgment suit, taken as a whole, are nothing more than bad faith gamesmanship for the sole purpose of forum shopping.  As such, NMS cannot rely on the first-to-file rule – a slight chronological advantage obtained through deception cannot deprive Perfect 10 of its choice of forum for its suit.

Courts have broad discretion whether to entertain declaratory judgment actions.  28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration. . . .") (emphasis added); *see, e.g., Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."); *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494 (1942) (noting that the district court was "under no compulsion to exercise" its jurisdiction under the Declaratory Judgment Act); *Amerada Petroleum Corp. v. Marshall*, 381 F.2d 661, 663 (5th Cir. 1967) (recognizing the district court's discretion to hear the declaratory judgment suit); *Terra Nova Ins. Co. v. Acer Latin America, Inc.*, 931 F. Supp. 852, 854 (S.D. Fla. 1996) ("As this Court has long noted, . . . a court always has discretion whether to entertain an action for declaratory relief.").

A declaratory judgment action should be dismissed where it has been filed solely in anticipation of an imminent coercive action, as here. *Ven-Fuel, Inc. v. Dep't of the Treasury*, 673 F.2d 1194, 1195 (11th Cir. 1982). Courts consistently have rejected a mechanical application of the first-to-file rule when faced with such anticipatory filings. *Great Am. Ins. Co. v. Houston Gen. Ins. Co.*, 735 F. Supp. 581, 585 (S.D.N.Y. 1990); *see also Allstate Ins. Co. v. Clohessy*, 9 F. Supp. 2d 1314, 1316 (M.D. Fla. 1998) ("this Court realizes that the 'first to file' rule should not be rigidly applied"); *New England Mach., Inc. v. Conagra Pet Prod. Co.*, 827 F. Supp. 732, 733 (M.D. Fla. 1993) ("[C]ourts have recognized that the 'first-filed rule' should not be mechanically applied, but rather, courts should also give consideration to factors and circumstances which may affect the competing forums.").

In *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746 (7th Cir. 1987), for example, the defendant filed a trademark infringement action four days after the plaintiff filed a declaratory judgment suit. *Id.* at 747. The Seventh Circuit affirmed the dismissal of the first-filed declaratory judgment action, reasoning that where a declaratory judgment action is filed in anticipation of a coercive action, the coercive action should proceed. *Id.* at 749-750. The fact that the plaintiff filed first did not give it a "'right'" to choose a forum. *Id.* "The wholesome purpose of declaratory acts would be aborted by its use as an instrument of procedural fencing either to secure delay or to choose a forum." *Id.* at 750 (internal citations omitted).

Numerous other cases have similarly refused to follow the first-to-file rule when, as here, the plaintiff, knowing that the defendant intends to file suit, engages in a "race to the courthouse" by preemptorily filing a declaratory judgment action. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 219 (2d Cir. 1978) ("When the declaratory judgment action has been triggered by a notice letter, this equitable consideration may be a factor in the decision to allow the later filed action to proceed to judgment in the plaintiffs' chosen forum."), *rev'd on other grounds by Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981); *Jasper Corp. v. Nat'l Union Fire Ins. Co.*, 13 Fla. L. Weekly Fed. D 25, at *5 (M.D. Fla. 1999) ("One such compelling circumstance [for not following the first-filed rule] is where one party, on notice of a potential lawsuit, files a declaratory judgment action in its home forum."); *Allstate Ins. Co.*, 9 F. Supp. 2d at 1316 (refusing to apply the first-filed

rule where declaratory judgment action was brought in "bad faith"); *Budget Rent A Car Corp. v. Miljack, Inc.*, 760 F. Supp. 135, 137 (N.D. Ill. 1991) (where Budget knew CRLA planned to file suit, asked CRLA to delay filing suit until December 31, 1990, and then filed its own declaratory judgment suit on December 31, "[e]quitable principles counsel[ed] against allowing the preemptive suit to proceed").[4]

Disregarding first-filed status for an anticipatory declaratory judgment suit protects the interest of the plaintiff in the coercive action to choose the forum for suit. "[T]he misuse of the Declaratory Judgment Act to gain a procedural advantage and preempt the forum choice of the plaintiff in the coercive action militates in favor of dismissing the declaratory judgment action." *Great Am. Ins. Co.*, 735 F. Supp. at 586; *see also Tempco*, 819 F.2d at 749-750 (the fact that plaintiff filed its declaratory judgment action first "does not give it a 'right' to choose a forum").

The facts in this case are far more compelling than those in cases in which the courts have dismissed a declaratory relief action simply due to forum shopping. Here, NMS accomplished its forum shopping through a plan of organized deceit. Both NMS' General Counsel and its Los Angeles litigation counsel lied to Perfect 10 regarding NMS' intentions and conduct, and urged Perfect 10 to hold off filing a suit here, not disclosing that NMS was running to file in Florida. Moreover, here, of course, NMS knew that the ruling in the Cybernet action would dispose of most of the issues in this case and that Judge Baird, who wrote the opinion in Cybernet, already had accepted transfer, under Related Case rules, of the Tri-Tech action, which is substantially identical to this action. To permit this case to proceed in Florida would sanction the most brazen form of bad faith forum shopping.

---

[4] Because NMS clearly knew Perfect 10 intended to file suit against it in the Central District, and affirmatively misled Perfect 10 about the undisclosed filing of its own suit, the fact that Perfect 10's coercive action was filed merely twelve days after the declaratory judgment suit was filed is of little weight. *Capitol Records, Inc. v. Optical Recording Corp.*, 810 F. Supp. 1350, 1355 (S.D.N.Y. 1992) ("[T]he date of filing is less important when the competing actions are filed within a short period of time.").

**B.    Complete Relief Can Be Afforded In The Central District Of California But Not In The Southern District Of Florida**

An important factor courts consider in exercising discretion to dismiss declaratory judgment actions is whether the court in which the coercive suit is pending can fully adjudicate the dispute between the parties. "A suit seeking declaratory relief may be dismissed if it appears that . . . in another action subsequently begun, involving the same parties and issues, the questions in controversy can be better settled and relief sought more expeditiously and effectively awarded than in the declaratory action." 5 Wright & Miller, *Federal Practice & Procedure* § 1238 n.6, at 286 (2002). Here, complete relief can be afforded only in the California action because: (1) the California action includes additional defendants other than NMS who are not parties in this action; (2) this action only addresses issues between NMS and Perfect 10, whereas the coercive suit encompasses Perfect 10's claims against NMS as well as multiple other parties; (3) the California action includes all of Perfect 10's legal claims against NMS, including violations of the California unfair competition and false advertising statutes, and RICO, and not merely the copyright, trademark, and right of publicity issues for which NMS seeks declaratory relief in this action; and (4) two related cases are already pending in the Central District of California, before a Court already familiar with the factual and legal issues. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 219 (2d Cir. 1978) (allowing later-filed coercive action to proceed because two additional suits presenting identical issues by the same plaintiff against different defendants were pending in the same court), *rev'd on other grounds by Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981); *Great Am. Ins. Co.*, 735 F. Supp. at 586 (dismissing plaintiff's declaratory judgment action because plaintiff's interests could be adjudicated in the later-filed coercive suit); *Koch Eng'g Co. v. Monsanto Co.*, 621 F. Supp. 1204, 1208 (E.D. Mo. 1985) (dismissing declaratory judgment action because coercive suit "will fully resolve the controversy between the parties").

California has an important relationship to the infringing activities of NMS and clearly has jurisdiction over all parties to the California action, including NMS. In the latter regard, specific jurisdiction over a non-resident is appropriate if: (1) the nonresident defendant "purposely avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws"; (2) the claim "arises out of or results from the defendant's forum-related

activities"; and (3) "exercise of jurisdiction [is] reasonable." *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998); *see also SEC v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997). NMS clearly has such a relationship to California.

*First*, through its wide-reaching, burgeoning Internet business, NMS has engaged in business with California webmasters and consumers, and has purposefully availed itself of the privilege of conducting business in California.[5]  (Zadeh Decl. ¶¶ 16, 19, Exhs. 3 at 1, 6 at 2 [Traffic Cash Gold claims to have "processed over *One Billion* unique clicks" (emphasis added), and Sex Check claims to be the "*world's* fastest growing adult verification service" (emphasis added)].)  *See Panavision*, 141 F.3d at 1320 (purposeful availment "is satisfied if the defendant 'has taken deliberate action' toward the forum state"); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) ("Traditionally, when an entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the exercise of specific jurisdiction is proper. Different results should not be reached simply because business is conducted over the Internet.").  Among other things, NMS secures its stolen content from California, markets that content through websites located in California to California consumers, and uses a payment processing contractor located in California.

NMS secures stolen content in California for its websites.  For example, NMS manages and markets the website at <truecelebs.com>, which obtains misappropriated content directly from a content supplier located in Chatsworth, California (*i.e.*, <babenet.com>).  (Zadeh Decl. ¶¶ 24, 15, Exh. 3 at 4 ["Traffic Cash Gold is marketed with the resources of Net Management Services. Traffic Cash Gold owns and operates all these sites independently."].)  Thus, NMS sells images improperly created in California by parties located in California.  Furthermore, that content infringes the rights of parties located in California (*e.g.*, Perfect 10, celebrities).  (*Id.* ¶ 11.)

---

[5] "California, the home of the Internet businesses in Silicon Valley and high-tech research institutions such as the California Institute of Technology and the University of California, holds such a substantial portion of the nation's Internet users that an entity which engages in electronic commerce over the Internet must expect their activities to reach a large number of California residents."  *Stomp, Inc. v. Neato, LLC*, 61 F. Supp. 2d 1074, 1079 n.9 (C.D. Cal. 1999).

NMS further markets the infringing content through websites located in California. For example, NMS directs its marketing efforts and pays substantial commissions to Referral Websites located in California, including <cybersexnetwork.com> (owned by Tri-Tech, a California corporation) and <celebrityhot.com> (owned by Sergey Haritonov, one of the California defendants in Perfect 10's coercive action). (*Id.* ¶¶ 16, 25-26.) These websites, among other things, contain advertising banners (which themselves contain misappropriated content) created by NMS, which direct customers to the Traffic Cash Gold Websites managed by NMS. (*Id.* ¶¶ 25, 26, Exhs. 15 at 1-2, 17.)

NMS also uses companies in California to process consumer payments for the misappropriated content on websites managed by NMS. For example, the websites at <truecelebs.com> and <celebticket.com>, managed by NMS, both have licensing agreements with <paycom.net>, a Marina del Rey, California company, responsible for processing these websites' subscribers' information. (*Id.* ¶ 22, Exhs. 10, 11.)

Indeed, websites managed and marketed by NMS employ agents and maintain records in California. For example, the website <truecelebs.com>, managed by NMS, employs 29 agents in California to maintain records required under federal law to prove that performers in the sexually explicit content on the website are at least 18 years of age. 18 U.S.C. § 2257.[6] (*Id.* ¶ 23, Exh. 12.) The employment of these agents in California alone establishes NMS' extensive ties to California.

And NMS is not a stranger to the litigation in the District Court in Los Angeles. NMS has used the Los Angeles District Court to sue competitors, including Cybernet, for unfair competition – the same type of claim advanced against NMS by Perfect 10 in the pending California litigation. Cybernet also is a party to the related litigation by Perfect 10 for unfair competition pending before Judge Baird. (*See* Request for Judicial Notice, Exh. 1.)

---

[6] This statute requires that any organization in the business of displaying adult content on the Internet maintain records in the hands of its employees proving that the individuals posing in the sexually explicit images are over 18 years of age. The organization must also identify to the public the employees housing the records. 18 U.S.C. § 2257(e)(2) ("the statement required by this subsection shall include the name, title, and business address of the individual employed by such organization responsible for maintaining the records required by this section").

*Second*, Perfect 10's claims arise out of NMS' contacts with California because (i) the alleged infringements occurred on the Traffic Cash Gold, Sex Check, and Referral Websites, which are marketed to customers in California on websites located in California; and (ii) the misappropriation occurred, in part, in California. *See Panavision*, 141 F.3d at 1322 (but for defendant's "registration of [plaintiff's] trademarks as his own domain names on the Internet" plaintiff would not have been injured in California); *Tech Heads, Inc. v. Desktop Serv. Ctr., Inc.*, 105 F. Supp. 2d 1142, 1151 (D. Or. 2000) (where the trademarks in controversy were used to identify the defendant's website and toll-free phone number, plaintiff's claims were "related to [defendant's] forum-related contacts"). Furthermore, Perfect 10 is being injured in California by NMS' use of both infringing Perfect 10 content and Perfect 10 models' names to direct Internet traffic to the Traffic Cash Gold, Sex Check, and Referral Websites instead of to Perfect 10's own legitimate website <perfect10.com>. *See Tech Heads, Inc.*, 105 F. Supp. 2d at 1151-1152 ("actual confusion in the marketplace" between defendant's and plaintiff's websites supported plaintiff's claim that violation of its trademarks arose from defendant's contacts with the forum state).

*Lastly*, it is reasonable for the Central District of California to assert personal jurisdiction over NMS because NMS has purposely interjected itself into California by actively recruiting webmasters across the country, including in California, to either participate in Traffic Cash Gold and Sex Check or to advertise for these sites, and NMS faces minimal burden defending itself in California because it has hired a California attorney who has already played a significant role in defending NMS. In addition, it is in California's interest to ensure that Perfect 10, a California business, receives redress for NMS' wrongdoing, and a California court is presumptively in the best position to adjudicate the state unfair competition and right of publicity claims, in particular the Central District of California, which is handling two similar actions brought by Perfect 10. *See Panavision*, 141 F.3d at 1323 (supporting personal jurisdiction in California because the state "maintains a strong interest in providing an effective means of redress for its residents tortiously injured") (internal citations omitted).

**IV.    AS AN ALTERNATIVE TO DISMISSAL, THIS CASE SHOULD BE TRANSFERRED TO THE CENTRAL DISTRICT OF CALIFORNIA PURSUANT TO 28 U.S.C. SECTION 1404(a)**

Under 28 U.S.C. section 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  Under section 1404(a), trial courts have broad discretion to transfer a declaratory judgment action to another district.  *Jasper Corp. v. Nat'l Union Fire Ins. Co.*, 13 Fla. L. Weekly Fed. D 25, at *4 (M.D. Fla. 1999) ("The standard for transfer under 1404(a) allows the trial court to exercise broad discretion.");  *New England Mach., Inc. v. Conagra Pet Prod. Co.*, 827 F. Supp. 732, 734 (M.D. Fla. 1993) (district courts have discretion to decide motions to transfer according to a case-by-case determination of "convenience" and "fairness").  In exercising their discretion, courts engage in a two-part inquiry:  (1) whether the action "might have been brought" in the transferee court, and (2) whether the "convenience of parties and witnesses" and the "interest[s] of justice" warrant a transfer.  *Meterlogic, Inc. v. Copier Solutions, Inc.*, 185 F. Supp. 2d 1292, 1299-1300 (S.D. Fla. 2002);  *Jewelmasters, Inc. v. May Dep't Stores Co.*, 840 F. Supp. 893, 894-895 (S.D. Fla. 1993),  *Cordis Corp. v. Siemens-Pacesetter, Inc.*, 682 F. Supp. 1200, 1201 (S.D. Fla. 1987);  *Windmere Corp. v. Remington Prod., Inc.*, 617 F. Supp. 8, 10-11 (S.D. Fla. 1985).  Each of these inquiries will be addressed in turn.

**A.    NMS' Declaratory Judgment Action "Might Have Been Brought" In The Central District Of California**

"An action 'might have been brought' in a proposed transferee court if: (1) the court had jurisdiction over the subject matter of the action; (2) venue is proper there; and (3) the defendant is amenable to process issuing out of the transferee court."  *Windmere Corp.*, 617 F. Supp. at 10; *see also Meterlogic, Inc.*, 185 F. Supp. 2d at 1299.  This case "might have been brought" in the Central District of California.  *First*, the case arises under federal copyright and trademark law, so a federal court in California has subject matter jurisdiction under 28 U.S.C. § 1331.  *Second*, Perfect 10 is incorporated and maintains its principal place of business in Los Angeles, California, so venue is proper under 28 U.S.C. § 1391(b).  *See also Meterlogic, Inc.*, 185 F. Supp. 2d at 1299-1300; *Jewelmasters, Inc.*, 840 F. Supp. at 894-895; *Windmere Corp.*, 617 F. Supp. at 10.  *Third*, the Central District of California has personal jurisdiction over Perfect 10, a California business.

**B.      The Interests Of Justice Require a Transfer of NMS' Declaratory Judgment Action To The Central District Of California**

From the standpoint of judicial economy, it makes the most sense to dismiss NMS' Florida action in favor of one comprehensive suit in California addressing all of the issues and the defendants in this matter.  In the alternative, however, it is also judicially efficient to transfer NMS' declaratory judgment action to the Central District of California where: (1) two related actions are already pending, and (2) Perfect 10's coercive action has already been filed.  *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 219 (2d Cir. 1978) (concluding that the district court "did not abuse its discretion by allowing the later filed action to proceed" because "at the time that this case was filed, two additional lawsuits against other defendants by [plaintiff] presenting the identical issue for resolution were pending in the Southern District of New York" and "[e]fficient and responsible judicial administration dictated that these three cases be tried before the same forum"), *rev'd on other grounds by Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981); *Meterlogic, Inc.*, 185 F. Supp. 2d at 1303 ("Simply stated, why allow two courts to decide similar issues when one court can decide these issues more efficiently?"); *Cordis Corp.*, 682 F. Supp. at 1202 (holding that transfer to the Central District of California was "in the interest of justice" because four related suits involving the same defendants and others were already pending in that district).

Indeed, as noted, Perfect 10 is currently a plaintiff in two factually and legally related actions in the Central District of California.  (Johnston Decl. ¶ 8.)  In the suit against Cybernet Ventures, Inc., District Judge Lourdes Baird recently issued a preliminary injunction and has ruled on two motions to dismiss addressing claims involving the same copyrights, trademarks, types of businesses, and activities at issue here.  (*Id.* ¶ 3.)  The second suit against Tri-Tech Internet Services is also pending before Judge Baird as a related case.  (*Id.* ¶ 8.)  Judge Baird is in the best position to try Perfect 10's coercive suit as well as the declaratory judgment action because she is already familiar with the relevant factual and legal issues.  *See Capitol Records, Inc. v. Optical Recording Corp.*, 810 F. Supp. 1350, 1355 (S.D.N.Y. 1992) (transferring declaratory judgment case from New York to Delaware in part because the judge for the coercive suit in Delaware, which involved the same parties and patents at issue in the declaratory judgment action, was knowledgeable about and

17

familiar with the relevant factual and legal issues due to his having presided over another related trial involving the same plaintiff and patents).

Additionally, Perfect 10's legal claims against NMS under California law for unfair competition (Cal. Bus. & Prof. Code § 17200 *et seq.*), false advertising (Cal. Bus. & Prof. Code § 17500 *et seq.*), common law right of publicity, and statutory right of publicity (Cal. Civ. Code § 3344) are most efficiently resolved in the Central District of California. A district court in California is better positioned to interpret California state law than a district court in Florida. *See Poncy v. Johnson & Johnson*, 414 F. Supp. 551, 556 (S.D. Fla. 1976) ("[T]he United States District Court in Newark, New Jersey is a more appropriate forum than this court for applying substantive New Jersey law to the various questions to which such law is applicable in these actions.")

**C.    It Is More Convenient For The Parties And The Witnesses If This Case Proceeds In California**

The Court should not be misled by NMS' likely argument that it will suffer hardship and inconvenience if it has to litigate its declaratory judgment action in California. NMS has hired an attorney in Los Angeles who has already been actively involved in this case. NMS' hiring of California counsel in response to Perfect 10's cease and desist letter strongly suggests that NMS was ready to defend itself in California, enough so to commence a deceptive scheme to avoid that obvious forum. In contrast, Perfect 10 has only California counsel and has no reason to seek representation in Florida other than to defend itself in NMS' declaratory judgment action. Furthermore, the case filed by Perfect 10 in the Central District of California has additional defendants who are not parties to this action.

Although the possible witnesses are yet to be determined, plaintiff's key witness is Dr. Norman Zadeh, the founder and CEO of Perfect 10. He is intimately familiar with Perfect 10's copyrights, trademarks, and publicity rights. Additionally, Dr. Zadeh has conducted hours of factual investigation into NMS' alleged infringements of Perfect 10's legal rights and is thus in the best position to testify about his findings. Dr. Zadeh resides in California and is actively involved in additional business matters in California in addition to Perfect 10. Dr. Zadeh is the backbone of

Perfect 10, and the business would flounder in the event of an extended absence from California. (Zadeh Decl. ¶ 27.)

It is arguably "inconvenient" for either Perfect 10 to litigate this matter in Florida or for NMS to litigate in California.  Given NMS' apparent bad faith "race to the courthouse," however, and courts' tendency to favor the plaintiff's choice of forum, *Gribin v. Hammer Galleries*, 793 F. Supp. 233, 237 (C.D. Cal. 1992) ("the allegedly aggrieved party is entitled to choose the time and place for suit"), the convenience factor should tip in favor of Perfect 10.

## V. AS AN ALTERNATIVE TO DISMISSING OR TRANSFERRING NMS' DECLARATORY JUDGMENT ACTION, THE ACTION SHOULD BE STAYED PENDING RESOLUTION OF THE CALIFORNIA PROCEEDINGS

For the reasons set forth above, this action should either be dismissed or transferred to the Central District of California.  In the alternative, however, this Court has discretion to stay the declaratory judgment action until the California suit has been resolved.  *See Amerada Petroleum Corp. v. Marshall*, 381 F.2d 661, 663-664  (5th Cir. 1967) (affirming district court's granting of a motion to stay the first-filed declaratory judgment suit in Texas pending the outcome of the coercive suit in New York); *Budget Rent A Car Corp. v. Miljack, Inc.*, 760 F. Supp. 135, 137 (N.D. Ill. 1991) (granting a motion to stay the declaratory judgment action in Illinois pending resolution of the coercive action in Oklahoma).  At a minimum, in light of the current overlapping and duplicative litigation activity in the Central District of California, a stay of this declaratory judgment action is appropriate.

19

## VI.  CONCLUSION

For the foregoing reasons, NMS' action for declaratory relief should be dismissed. Alternatively, NMS' action should be transferred to the Central District of California or stayed pending the outcome of Perfect 10's Coercive Action.

Dated:  June 7, 2002

Respectfully submitted,

ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
Office in the Grove, Penthouse
2699 South Bayshore Drive
Miami, Florida  33133
Tel. No.: 305/858-2900
Fax No.: 305/858-5261
E-mail: ssantini@abwc.com

By: _____
Sean R. Santini
Florida Bar No.  832898

Attorneys for Defendant Perfect 10, Inc.

BERMAN, MAUSNER & RESSER
JEFFREY M. MAUSNER
[Application for Special Appearance Pending]
4727 Wilshire Blvd., Suite 500
Los Angeles, California 90010-3874
Tel. No.: 323/965-1200
Fax No.: 323/965-1919
E-mail:  jmausner@bmrlaw.com

Of-Counsel for Defendant Perfect 10, Inc.

ARNOLD & PORTER
RONALD L. JOHNSTON
BRIAN K. CONDON
[Applications for Special Appearance Pending]
1900 Avenue of the Stars, 17th Floor
Los Angeles, California 90067
Tel. No.: 310/552-2500
Fax No.: 310/552-1191
E-mail:  ronald_johnston@aporter.com
          brian_condon@aporter.com

Of-Counsel for Defendant Perfect 10, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Federal Express on this 7th day of June, 2002, upon all counsel on the following service list.

SEAN R. SANTINI

## SERVICE LIST

Jay M. Spillane
FOX & SPILLANE LLP
1880 Century Park East, Suite 1114
Los Angeles, California 90067
Tel. No.: 310/229-9300
Fax. No.: 310/229-9380

Attorneys for Plaintiff Net Management Services

Lee A. Weintraub
BECKER & POLIAKOFF, P.A.
Post Office Box 9057
Fort Lauderdale, Florida 33310-9057
Tel. No. 954/985-4147
Fax. No. 954/985-4176

Attorneys for Plaintiff Net Management Services