UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 02-60585 - Civ - Dimitrouleas

NET MANAGEMENT SERVICES, a Nevis )
limited liability company, )
 )
        Plaintiff, )
 )
v. )
 )
PERFECT 10, INC., a California corporation, )
and DOES 1-10, inclusive, )
 )
        Defendants. )
 )
 )
_____ )



**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PERFECT 10, INC.'S MOTION TO DISMISS, TRANSFER OR STAY PLAINTIFF'S COMPLAINT FOR DECLARATORY RELIEF**

I.  **PRELIMINARY STATEMENT**

After this motion was filed, on June 25, 2002 the District Court for the Central District of California determined that the California action filed by Perfect 10, Inc. ("Perfect 10") against Net Management Services ("NMS") is related to the cases already pending in the Central District before District Judge L.G. Baird, and ordered the NMS case transferred to Judge Baird's court for all further proceedings, expressly finding that the cases

> "appear to arise from the same or substantially identical transactions, happenings or events"; "call for determination of the same or substantially identical questions of law"; and "likely for other reasons may entail unnecessary duplication of labor if heard by different judges."

(Supplemental Request for Judicial Notice, Ex. 2; *see also* Johnston Decl., Ex. 4 [Notice of Related Cases].) Thus, the district court in California has already determined that the NMS case is factually and legally similar to other actions in that district, and that unnecessary duplication of labor will result if the cases are handled by different judges (*id.*), as would certainly occur if NMS's declaratory relief action were permitted to remain in Florida.[1] This order from the Central District of California entirely disposes, of course, of plaintiff NMS's argument that "Perfect 10 has demonstrated no legal relation between these three cases" pending in California. (Opposition, p. 2.)[2]

NMS's opposition to Perfect 10's motion to dismiss, transfer or stay in this Court is based on a series of falsehoods – both as to the circumstances leading to its filing of this declaratory relief action and as to its California-related business activities. This reply brief (and accompanying evidence) will rebut NMS's fictional assertions that there are no infringements on the websites within its Traffic Cash Gold and SexCheck networks, that NMS has no pertinent contacts in California, and that NMS did not engage in a race to the courthouse to avoid jurisdiction in the Central District of California. The true facts make plain that this action should be dismissed under the Court's discretionary jurisdiction over declaratory relief claims, and that the interests of justice require this claim to be litigated in the Central

---

[1] Judicial economy is, of course, a factor weighted heavily in departing from the first-to-file rule. *See, e.g., Riviera Trading Corp. v. Oakley, Inc.*, 944 F.Supp. 1150, 1158 (S.D.N.Y. 1996).

[2] Because of the clear tenor of the Central District court's related case order, there appears to be no legitimate reason for NMS's request that this Court rule upon the instant motion before the August 12, 2002 hearing date on NMS's motion to dismiss the Central District action. (*See* NMS's Notice of Filing and Request for Ruling, filed on or about June 28, 2002.)

District of California, along with Perfect 10's more complete, coercive action against NMS and the two other related actions in that Court.

## II.   NMS'S BUSINESS OPERATIONS AND CALIFORNIA CONTACTS

NMS's opposition attempts to create a false picture of a company that has no knowledge of blatant copyright and publicity right infringements on websites that it admittedly "manages."[3] NMS also falsely argues that as a Florida-based company, it cannot be sued in California even though it is operating nationwide over the Internet, relying on California businesses for the content and payment processing to conduct its operations, and infringing the rights of persons in California on its websites. These assertions are contrary to evidence already in the record, NMS's own statements and those of its representatives, and evidence submitted by Perfect 10 in the Central District of California (*see* Supp. Zadeh Decl., ¶¶ 2, 8-34 & Exs. 19-52), which NMS apparently felt free to disregard in this Court.

**NMS's Business Operations**. Although NMS denies that is the "hub" of a ring of pornographic websites displaying infringing content, NMS nonetheless admits it is engaged in three business operations that are essential to the publication of infringing content on the Internet: NMS "managed" subscription websites; the "SexCheck" service and linked websites; and the "Traffic Cash Gold" referral websites. (Opposition, pp. 3-4.)

*First*, NMS admits that it manages the subscription websites at <truecelebs.com>, <rogerceleb.com>, <secretceleb.com>, and <celebticket.com>. (Opposition, p. 3; Bennett Decl., ¶¶ 11-13; NMS Request for Judicial Notice ("NMS RJN"), Ex. 5 to Ex. F, p. 4.) NMS provides customer service for these sites (Supp. Zadeh Decl., ¶ 9, Exs. 19, 20, 21), facilitates memberships to the sites through its own website at <netmgt.com> (*id.*, ¶ 9, Ex. 22), processes customers' credit card information through links on its webpage at <processor.netmgt.com/signup> (*id.*, ¶ 10, Ex. 23), and provides and enforces the sites' legal policies. (*Id.*, ¶ 11, Exs. 24, 25, 26 & 27.) NMS also admits it controls the content on those sites. (NMS RJN, Ex. 5 to Ex. F, p. 5 ["*NMS elected to re-design these*

---

[3] NMS never explains how the alleged distinction between "managing" and "owning" infringing websites might make any legal difference for purposes of the issues before the Court on this motion, and it does not. *See Pedrosillo Music, Inc. v. Radio Musical, Inc.*, 815 F.Supp. 511, 515 (D.P.R. 1993) (manager liable for copyright infringement based on control, management, operation and maintenance of the infringer's affairs).

2

*four sites* such that they currently report on the appearances of 'celebrities' in movies, television or in public"], italics added.) Each of these sites (i) contains blatant infringements of Perfect 10's copyrighted images (Supp. Zadeh Decl., ¶¶ 32-33 and Exs. 50, 51); (ii) contains unauthorized images of numerous celebrities (*id.*, ¶¶ 9, 18 & Exs. 19, 20 & 34, p. 2) which constitute unfair competition against Perfect 10; and (iii) utilizes banner advertising containing false representations about nude celebrities to entice visitors, with come-ons such as "Check Out Buffy's Muffy. Click Here Now," "Britney Spears Exposed!" and "Hot Teen Celebrities Get Naked Inside!" (*Id.*, ¶¶ 20, 22 & Exs. 38, 40; Zadeh Decl., Ex. 4.) Inconceivably, NMS falsely asserts in its opposition that there is "*no evidence* of any unlawful use" on these sites. (Opposition, p. 3; Bennett Decl., ¶ 12.)

*Second*, NMS admits that it manages <SexCheck.com>, a purported "adult verification service" site, through which NMS sells consumers a SexCheck pass providing access for a single fee to thousands of SexCheck websites. (Opposition, p. 3, Bennett Decl., ¶ 14; Zadeh Decl., ¶ 19, Ex. 6; Supp. Zadeh Decl., ¶ 12 & Exs. 28, 29.) SexCheck subscribers enter into a contract directly with NMS. (Supp. Zadeh Decl., ¶ 12, Ex. 28.) NMS admits that it provides content for SexCheck sites and reviews the content submissions by SexCheck sites. (Bennett Decl., ¶¶ 14, 15.) The SexCheck websites, such as <sinfulcelebs.com>, <teenymovies.com>, and <celebrity-voyeur.com>, are littered with (i) infringing images of Perfect 10 copyrighted photos, including celebrity head shots superimposed on the bodies of numerous Perfect 10 models (Supp. Zadeh Decl., ¶¶ 27-31 & Exs. 46-49 & 53), and (ii) unauthorized celebrity images and counterfeit pictures of celebrities purportedly engaged in sexual activities. (*Id.*, ¶ 35 & Ex. 54.)[4] Once again, inconceivably, NMS falsely asserts in its opposition that there is "*no evidence* of any violation of [Perfect 10's] rights on Sex Check"! (Opposition, p. 4.)

*Third*, NMS admits that it manages what it calls an advertising "affiliate" program, "Traffic Cash Gold." (Opposition, p. 4; Bennett Decl., ¶ 18.) Despite NMS's somewhat benign description of

---

[4] Exhibit 54 is a CD-ROM that contains executable files allowing a demonstration of the unlawful content on one of the SexCheck websites, <celebrity-voyeur.com>. Although the files on the CD-ROM were downloaded from that website on July 1, 2002 (*see* Declaration of Patrick Swart), NMS nonetheless falsely states that there has been no "celebrity" content on Sex Check websites since February 2002. (Opposition, p. 4; Bennett Decl., ¶ 16.)

3

this program, NMS's own materials state that through Traffic Cash Gold, NMS's mission is to "provide our current & potential customers with unsurpassed high quality, exclusive still & interactive content across our entire network of Web Sites." (Zadeh Decl., Ex. 3; Bennett Decl., Ex. C [". . . the entire network of Web Sites managed by NMS"]; Supp. Zadeh Decl., Ex. 31.) NMS pays affiliate websites weekly commissions to direct traffic to NMS-managed subscription websites, and NMS provides the affiliates with banner advertising links to the NMS sites for the affiliates to "grab" from the Traffic Cash Gold website and display on their sites. (Bennett Decl., Ex. C ["Head over to our banners section in the Ad Tools"].) The banner ads contain unauthorized celebrity images and false representations about nude celebrities or celebrities engaged in sexual activities. (Zadeh Decl., ¶ 17 & Ex. 4; Supp. Zadeh Decl., ¶¶ 20, 22 & Exs. 38, 40.) As to the "high quality . . . content" offered on these affiliate websites, it includes infringements of Perfect 10 copyrighted images, unauthorized celebrity images, and fake celebrity "nudes". (*See, e.g.*, Supp. Zadeh Decl., ¶¶ 24-25 & Ex. 45.)

**NMS's California Contacts**. In addition to fictionalizing its business operations, NMS also attempts to minimize its ties to California through the same sleight of hand. The facts are, contrary to NMS's statements, that NMS is managing, operating, and profiting from the websites on the SexCheck and Traffic Cash Gold networks and is clearly "doing business" over the Internet with substantial ties to California. *First*, many of the images contained on websites in the NMS-managed network are obtained from dozens of content providers located in California (Zadeh Decl., ¶¶ 23-26 & Exs. 12-18; Supp. Zadeh Decl., ¶ 17 & Ex. 32), at least three of which admittedly have agreements with NMS. (Bennett Decl., ¶ 33.) *Second*, NMS utilizes credit card processors located in California for both its NMS-managed subscription websites and for the payments of subscribers to its SexCheck service. (Zadeh Decl., ¶ 22 & Exs. 10-11; Supp. Zadeh Decl., ¶¶ 14-16 & Exs. 35-37.)[5] *Third*, some of the affiliate websites that are part of NMS's Traffic Cash Gold network are owned by California residents and located in California, including parties who are defendants in the Central District of California

---

[5] As just one example of the falsehoods contained in NMS's opposition, NMS asserts that it "has no agreements with Paycom, a processing company that Perfect 10 says has offices in California." (Opposition, p. 6.) In reality, the "Terms and Conditions" of SexCheck state that when a member subscribes to SexCheck, he authorizes the "COMPANY'S payment processing agent (Paycom.net . . . ) to charge your credit card." "COMPANY" is defined as "Net Management Services, LLC." (*See* Supp. Zadeh Decl., Ex. 35 at ¶¶ 1, 7.)

action. (Zadeh Decl., ¶¶ 25-26 & Exs. 15-18; Supp. Zadeh Decl., ¶¶ 20-22, 24 & Exs. 38-44.) *Fourth*, according to published interviews of NMS's co-founder and executive, Joseph Elkind, he had a California studio for photo shoots and maintained computer servers in Los Angeles. (Supp. Zadeh Decl., Ex. 55.) In addition, Mr. Elkind, whom NMS states has no relation to California (Bennett Decl., ¶¶ 38, 43), in fact conducted business in Los Angeles on a July 2000 trip. (Supp. Zadeh Decl., Ex. 55.) *Fifth*, although discovery has not yet been conducted, there are undoubtedly thousands of California-resident subscribers to NMS's managed subscription websites and SexCheck service.[6]

### III.   NMS ENGAGED IN A RACE TO THE COURTHOUSE TO AVOID LITIGATION IN CALIFORNIA

In arguing that the present motion should be denied, NMS analyzes only the "factors that [the Court] should consider in weighing a request for a transfer for convenience under 28 U.S.C. § 1404(a)." (Opposition, p. 9.) NMS does this for good reason -- to attempt to minimize the effect of its conduct leading up to the filing of this action, namely that NMS deceived Perfect 10 in order to engage in improper forum shopping by filing an anticipatory declaratory judgment action. Based on these facts and others, the Court has discretion to decline jurisdiction outright by dismissing this declaratory judgment action. However, even if the Court does not dismiss this action, it should be transferred to the Central District of California or, at a minimum, stayed, since the only factors that even arguably weigh in favor of this action remaining in this District are based on NMS's bad-faith conduct.

#### A.   The Court Has Discretion To Dismiss This Action

NMS contends that it was unaware that Perfect 10 intended to file suit against it, and that it filed this declaratory relief suit to obtain a court ruling so that Perfect 10's threats would not be held "over the heads of NMS and its clients indefinitely." (Opposition, p. 7.) This is a creative revision of the events leading to the filing of this and the Central District of California lawsuits. NMS would have the Court believe that, although its principals and lawyers pleaded, orally and in writing, with Perfect

---

[6] NMS inexplicably argues in its opposition that a Florida forum would be appropriate because *Perfect 10* operates an interactive membership website over the Internet and sells magazines in Florida. (Opposition, p. 6; Declaration of Robert Devin.) Although Perfect 10 has not contended to the contrary about its operations, NMS's argument serves only to demonstrate that NMS's own interactive Internet business subjects it to jurisdiction in California.

5

10 *not to file litigation* against it (*see* Johnston Decl., ¶ 4 & Ex. 7; Mausner Decl., ¶¶ 2-4 & Ex. 1), NMS nonetheless had no knowledge that Perfect 10 intended to file suit before NMS raced to the courthouse to get the present action on file.

The actual facts are that Perfect 10's cease and desist letter was submitted on April 9, 2002. (Zadeh Decl., Ex. 2.) Between April 9 and May 1, 2002, NMS fraudulently led Perfect 10 to believe it wished to resolve the matter without litigation, while secretly filing its own declaratory relief suit on April 25, 2002. (Johnston Decl., ¶ 4 & Ex. 7; Mausner Decl., ¶¶ 2-4 & Ex. 1.) NMS was fully aware that Perfect 10 intended to sue – NMS's counsel mentioned the threat of litigation by Perfect 10 no less than *seven* times in his letter of April 26, 2002 alone.[7] Any suggestion now that NMS filed this action innocently, without believing that Perfect 10 intended to sue it, is a fiction.[8] Moreover, NMS filed this declaratory relief action a mere two weeks after receiving Perfect 10's cease and desist letter, which hardly corroborates NMS's stated concern with an "indefinite" threat hanging over it.

In identical circumstances, courts regularly disregard the first-to-file rule and dismiss the prior-filed declaratory relief action, so as not to punish a party who attempts an informal resolution of a cease and desist letter before filing litigation. For example, in *Anheuser-Busch, Inc. v. Supreme Int'l Corp.*, 167 F.3d 417, 419 (8th Cir. 1999), the court refused to apply the first-filed rule and upheld dismissal of the declaratory relief action where the declaratory relief plaintiff "was on notice that [defendant] was going to file suit" and "less than two weeks passed from the time [defendant] sent its cease and desist letter to [plaintiff] to the time" defendant filed its coercive action, "suggesting that [plaintiff] raced to the courthouse to usurp [defendant's] forum choice." Similarly, in *PAJ, Inc. v.*

---

[7] NMS's counsel's letter variously references that NMS "was interested in reaching a resolution; without litigation"; "whether NMS wanted to be a 'test case'"; that he "could not confirm whether or not Perfect 10 intends to file a lawsuit after April 29, 2002"; that "it would be incumbent on your client to look at the results of the redesign before making further threats of litigation on this point"; that "we would like to have an opportunity to discuss this area with you before your client makes the unfortunate choice to commence litigation"; that "[w]e trust that litigation will not be necessary"; and "please commit in writing whether [Perfect 10] is willing to forebear filing suit past April 29, 2002." (Mausner Decl., Ex. 1.)

[8] NMS's contention that Perfect 10's California suit was merely defensive in nature is also false. While the timing of Perfect 10's filing was obviously based on NMS's disclosure of this lawsuit on May 1, 2002, signalling NMS had no intention of working matters out informally, Perfect 10 always intended to file suit if necessary and was planning to do so. (*See* Supp. Zadeh Decl., ¶¶ 3-7.) The conflicting renditions of statements attributed to Dr. Zadeh by Mr. Steve Easton are false. (*Id.*, ¶ 7.)

*Yurman Design, Inc.*, 1999 WL 68651, *3 (N.D. Tex. 1999), the court dismissed a first-filed declaratory relief claim because to do otherwise "would penalize [defendant] who made a good faith effort to resolve the matter without the assistance of the Courts through its cease and desist letter," and "knew it was under the impending threat of litigation" when it filed the declaratory relief action "one day prior to the expiration of [defendant's] imposed deadline." *See also Hanson PLC v. Metro-Goldwyn-Mayer Inc.*, 932 F.Supp. 104, 107 (S.D.N.Y. 1996) (dismissing declaratory relief suit filed three days after cease and desist letter and representations of plaintiff's counsel that they wanted to discuss settlement, ruling that "allowing this action to proceed would discourage potential plaintiffs from initiating settlement discussions prior to filing suit"). NMS engaged in the same conduct here, and Perfect 10 would be punished for issuing a cease and desist letter were the Court to retain this declaratory relief action in Florida.

    **B.    The Relevant Factors With Regard to Transfer Favor A Transfer Of This Action To The Central District Of California**

NMS has compounded the unfairness inherent in its actions by relying on its fraudulently secured "first-filed" status in analyzing the factors relevant to the Court's consideration of Perfect 10's alternative request that this action be transferred to the Central District of California. NMS points to six factors that the Court should consider in determining whether this action should be transferred. (Opposition, p. 9.) However, none of these factors weigh in favor of Florida, especially when considered in the context of NMS's conduct in filing this action.

**The convenience of the parties favors litigation in California.** NMS argues that this action should not be transferred because NMS maintains its offices and files in Florida or Nevis, and litigation in California would impose a substantial hardship. (Opposition, p. 10.)[9] NMS completely ignores the fact that Perfect 10 is located in California, and litigation in Florida would impose a substantial hardship on Perfect 10. When either forum would require one party to travel across the country, the inconvenience of the aggrieved party, in this case Perfect 10, should be accorded more

---

[9] NMS also argues that litigation in California would be inconvenient because there are other parties in the coercive action that are not located in California. (*See id.*) However, the present motion involves the transfer of this action in which only Perfect 10 and NMS are parties. Therefore, the location or convenience of other parties in another action is irrelevant to whether a transfer serves the interests of "convenience" for the parties *in this action*.

weight than the similar inconvenience alleged by NMS. *See PAJ, Inc.*, 1999 WL 68651, at *4 ("the alleged infringer, should not be allowed to alleviate its litigation expense by filing an anticipatory declaratory judgment action").

**Many of the alleged events took place in California.** NMS baldly asserts that "any conduct of NMS was undertaken in Florida" and that Perfect 10 has failed to prove that the "effects" of NMS's conduct were felt in California.[10] (Opposition, pp. 10-11.) NMS, however, is simply incorrect that its conduct did not occur in California. In addition to the many activities in which NMS engages as part of its business in California (discussed *supra* in Section II), the actual misappropriation of content from Perfect 10 and others occurred in California. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1006 (9th Cir. 2001) (finding that the use of a photograph obtained in California in a catalog distributed nationwide meant that any misappropriation of the names and likenesses of the persons portrayed in the photograph occurred in California). Thus, a crucial and substantial part of the alleged misconduct occurred in California, not Florida.

**Physical evidence is in California.** Again, NMS ignores half of the equation in analyzing where the physical evidence relevant to this action is located. While many of NMS's records may very well be in Florida, Perfect 10's records are in California, including Perfect 10's records relating to its copyrights and trademarks. Thus, the balance of convenience with respect to this factor tips in favor of California. *See Riviera Trading Corp., supra*, 944 F.Supp. at 1159 (in patent infringement case, fact that documentary evidence regarding the patents at issue was in California tipped the balance of convenience in favor of California even though numerous witnesses and documents relating to the infringing products were in New York).

**The California Court is more familiar with the law applicable to this action.** In light of the Central District of California's determination that the coercive action filed by Perfect 10 is related to two other actions pending before Judge Baird in the Central District (Supplemental Request for

---

[10] NMS cites cases addressing the "proof" required to demonstrate personal jurisdiction in support of its assertion that Perfect 10 must provide evidentiary support that the "effects" of NMS's conduct have been felt in California. (*Id.* at 11.) In fact, Perfect 10 has provided ample proof that it, among others, have been injured in California by NMS's conduct. (*See, e.g.*, section II *supra*.) In stark contrast, NMS merely states that its conduct occurred solely within Florida with no proof or support for that proposition. (Opposition, p. 10.)

Judicial Notice, Ex. 2), NMS's suggestion that the Southern District of Florida is more familiar with the applicable law is not convincing. The California court has already determined that this action involves the "determination of the same or substantially identical questions of law" as two other actions pending before it. (*Id.*)

NMS argues, however, that this Court is more familiar with the applicable law because the applicable state law is Florida. (Opposition, pp. 11-14.) This argument is incorrect and only further reveals NMS's improper motives in filing this action. NMS argues that in determining which state's law applies to Perfect 10's state law claims, this Court should apply Florida choice of law principles. (*Id.* at 12.) This is only the case, however, because, in federal question cases, federal courts apply the choice of law principles of the forum state with respect to state law claims. *See Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996). Thus, the only reason Florida choice of law principles would apply to the state law claims in this action is because NMS engaged in a deceitful race to the courthouse to file this action in Florida.

The state law claims in the coercive action pending in the Central District of California are governed by California's choice of law principles. *See id.* Under California choice of law principles, California law applies to Perfect 10's state law claims. *See S.A. Empresa De Vinco Rio Grandese v. Boeing Co.*, 641 F.2d 746, 749 (9th Cir. 1981) (California generally employs the "governmental interest analysis," and "California law will be applied unless the foreign law conflicts with California law and California and the foreign jurisdiction have significant interests in having their law applied"); *Downing*, 265 F.3d at 1006-1007 (under "governmental interest" analysis, California law applied to misappropriation claims based on defendant obtaining a photograph of plaintiffs in California and using photograph in a catalog); *Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1028 (C.D. Cal. 1998) ("cases based on publicity rights under [Cal. Civ. Code] § 3344 have typically selected the law of the property owner's domicile when resolving choice of law questions under California's governmental interests test"); *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal.App.4th 881, 901 (1998) (finding that California's interest in protecting the freedom of movement of persons that California-based employers wished to employ was all the more important as a statement of California public policy when invoked by a California employer to protect itself from "unfair competition" under

9

Cal. Bus. & Prof. Code § 17200).

However, even if NMS were correct that Florida choice of law principles apply in this case, NMS's own articulation of those principles demonstrates that California law applies. While NMS argues that the location of the party committing unfair competition is the most important choice of law factor, the cases cited by NMS actually state that the location of the *conduct* of the party committing unfair competition is usually entitled to the greatest weight. (Opposition, pp. 13-14.) As discussed *supra*, crucial elements of NMS's conduct giving rise to Perfect 10's state law claims, namely the misappropriation of content, occurred in California, not Florida. Thus, even under the principles articulated by NMS, California law applies.

**The relative congestion of the California Court and this Court is insignificant.** NMS contends that the fact that the median time to bring a case to trial in this District is 19.3 months compared to 21.0 months in the Central District of California weighs in favor of this action remaining in this District. (Opposition, p. 14.) This difference of less than two months, however, is insignificant and does not warrant a transfer. *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264, 273-274 (C.D. Cal. 1998).

**The interests of justice clearly weigh in favor of litigation in California.** NMS relies heavily on the presumption from its first-filed status. However, the first-to-file rule should not be applied in this case. The interests of justice dictate that this action should be dismissed or transferred to the Central District of California since the only reason this action is before this Court is because NMS engaged in a deceitful race to the courthouse in order to deprive Perfect 10 of its right to choose a forum for its claims.

Dated:  July 10, 2002

BERMAN, MAUSNER & RESSER
Jeffrey M. Mausner

ARNOLD & PORTER
Ronald L. Johnston
Brian K. Condon

Attorneys for Defendant Perfect 10, Inc.

ARAGON, BURLINGTON, WEIL & CROCKETT, P.A.
Office in the Grove, Penthouse
2699 South Bayshore Drive
Miami, Florida  33133
Tel. No.: 305/858-2900
Fax No.: 305/858-5261
E-mail: ssantini@abwc.com

By: _____
       Sean R. Santini
       Florida Bar No.  832898

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Federal Express on this 10th day of July, 2002, upon all counsel on the following service list.

_____
SEAN R. SANTINI

## SERVICE LIST

Jay M. Spillane
FOX & SPILLANE LLP
1880 Century Park East, Suite 1114
Los Angeles, California 90067
Tel. No.: 310/229-9300
Fax. No.: 310/229-9380

Attorneys for Plaintiff Net Management Services

Lee A. Weintraub
BECKER & POLIAKOFF, P.A.
Post Office Box 9057
Fort Lauderdale, Florida 33310-9057
Tel. No. 954/985-4147
Fax. No. 954/985-4176

Attorneys for Plaintiff Net Management Services

262331